**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re: ) | |
| ) | **Chapter 7** |
| GLOUCESTER ENGINEERING CO., INC., ) | Case No. 10-12967-JNF |
| ) | |
| Debtor. ) | Involuntary Chapter 7 |
| ) | Petition Pending |

**DEBTOR'S MOTION FOR AN ORDER (A) AUTHORIZING POSTPETITION FINANCING ON A FIRST PRIORITY SECURED BASIS; (B) GRANTING SENIOR LIEN AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (C) AUTHORIZING USE OF CASH COLLATERAL; (D) SCHEDULING FINAL HEARING ON POSTPETITION FINANCING AND USE OF CASH COLLATERAL AND (E) GRANTING RELATED RELIEF**
*(Expedited Determination Requested)*

To the Honorable Joan N. Feeney, United States Bankruptcy Judge:

Pursuant to Sections 363 and 364 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001 and MLBR 4001-2, Gloucester Engineering Co., Inc. (the "Debtor"), the debtor in the above-captioned proceeding, respectfully requests that this Court enter an Order (A) authorizing the Debtor to obtain post-petition financing of up to $6,000,000.00 secured by a first priority lien against the Debtor's assets pursuant to the terms of a loan commitment (the "DIP Loan") from Blue Wolf Equipment Holdings, LLC ("Blue Wolf"), (B) authorizing the Debtor to grant superpriority administrative expense status to Blue Wolf, (C) authorizing the Debtor to immediately borrow the sum of $3,000,000 for the expenses described in this motion (the "Interim Financing"), (D) authorizing use of cash collateral to fund operations (E) scheduling a final hearing (the "Final Hearing") with respect to the approval of the DIP Loan and related documents no later than thirty (30) days from the approval of the Interim Financing, and (F) granting certain related relief. A copy of the DIP Loan term sheet is attached as Exhibit

"A".[1]  As set forth in greater detail herein, the DIP Loan will provide critical funding to the Debtor in order to meet its immediate cash requirements and to provide an ongoing credit facility needed for the continued operation and restructuring of the business.  The DIP Loan is therefore an essential element to its reorganization.  Similarly, the use of cash collateral will complement the funds available pursuant to the DIP Loan and provide essential liquidity to fund ongoing expenses of operation.

In further support of this motion, the Debtor states as follows:

### I.  FACTUAL BACKGROUND

1. On March 23, 2010 (the "Petition Date"), Plastifar, S.A., Ranor, Inc., and HUB Technologies, Inc. (the "Petitioning Creditors") filed an involuntary Chapter 7 bankruptcy petition against the Debtor.   The Debtor did not answer the involuntary petition.

2. On April 23, 2010, two of the Petitioning Creditors, Plastifar, S.A. and HUB Technologies, Inc., filed a motion to dismiss the bankruptcy case, which motion was denied by this Court by order dated June 3, 2010.

3. Also on June 3, 2010, the Court entered an order establishing June 18, 2010 as the deadline for additional creditors to join as petitioning creditors pursuant to Section 303(b) of the Bankruptcy Code.

4.  On or about June 18, 2010, Insco Corporation, CENSCO, LLC, Minuteman Controls Co., Inc. and Bacon Felt Co., Inc. joined or moved to join the remaining Petitioning Creditor's petition.

5. On June 25, 2010, the Debtor filed a motion for entry of an order for relief ("Order for Relief") and to voluntarily convert the case to a Chapter 11 proceeding.

---

[1] The parties are working on completion of a final DIP Loan agreement which will subsequently be filed with the Court.

2

A. **The Debtor.**

6. The Debtor is a Delaware corporation that is one of the largest producers and servicers of plastic film extrusion equipment in the world. The Debtor has over 1200 film extrusion lines installed at all of the major global producers of plastic film. Its headquarters, factory, and principal place of research and development are in Gloucester, Massachusetts. The Debtor's customers, sales, and service personnel, however, are global.

7. The Debtor had revenues in 2009 totaling approximately $41,000,000.00.

8. The Debtor has approximately 70 employees, of which 55 are located in Massachusetts.

9. In October 2007, John Sharood and Richard Murphy, partners in the private equity firm Mousam Ventures LLC, assisted in a management buy out of the Debtor. On or about October 29, 2007, Battenfeld Gloucester Engineering Co., Inc. ("BGE") and the Debtor entered into a Purchase Agreement which provided for, among other things, the sale by BGE to the Debtor of one hundred (100) units owned by BGE in Battenfeld Gloucester, LLC ("BG LLC") for the sum of $12,500,000.

B. **Pre-petition Secured Debt.**

10. On or about October 29, 2007, the Debtor entered into a Loan and Security Agreement with Silicon Valley Bank ("Silicon"), as subsequently modified by the Waiver and First Loan Modification Agreement dated September 11, 2009, the Second Loan Modification Agreement (Domestic) dated October 9, 2009, and the Third Loan Modification and Forbearance Agreement (Domestic) dated February 25, 2010 (collectively, the "Domestic Loan Agreement"). The Domestic Loan Agreement provided essentially for a line of credit to the Debtor with

availability under the line based upon eligible domestic accounts. As part of the revolving line, Silicon agreed to issue or have issued letters of credit for the Debtor's account. The advances made by SVB under the Domestic Loan Agreement were secured by a lien upon substantially all of the Debtor's assets.

11. On or about December 7, 2007, the Debtor and BG LLC, its predecessor, entered into the Export-Import Bank Loan and Security Agreement with Silicon, as subsequently amended by the Waiver and Export-Import Bank First Loan Modification Agreement dated September 11, 2009, the Export-Import Bank Second Loan Modification Agreement dated October 9, 2009, and the Export-Import Bank Third Loan Modification and Forbearance Agreement dated February 25, 2010 (collectively, the "Foreign Loan Agreement"). The Foreign Loan Agreement provided a line of credit to the Debtor to finance its export-related sales, with availability based upon eligible non-domestic accounts. As with the Domestic Loan Agreement, Silicon agreed to issue or have issued letters of credit for the Debtor's account and Silicon was granted a lien upon substantially all assets to secure its advances.

12. The Domestic Loan Agreement and Foreign Loan Agreement (collectively, the "Loan Agreements") contained cross-default provisions. Additionally, collateral for each Loan Agreement served to secure the indebtedness under both Loan Agreements. The Loan Agreements also contained cross-subordination provisions (such that the lien granted Silicon under the Domestic Loan Agreement on non-domestic accounts, inventory, and intangibles was subordinate to the lien granted to it under the Foreign Loan Agreement and, similarly, the lien granted Silicon under the Foreign Loan Agreement on domestic accounts, inventory, and intangibles was made subordinate to the liens on such assets securing the Domestic Loan Agreement indebtedness).

4

13. The modifications made to the Loan Agreements, among other things, increased the Debtor's borrowing availability to $6,000,000.

14. On or about September 11, 2009, the Debtor entered into an Intellectual Property Security Agreement with Silicon, pursuant to which Silicon was granted a lien upon certain intellectual property not subject to the Loan Agreements.

15. On or about May 25, 2010, Silicon made a nonrecourse assignment of its rights under the Loan Agreements and related documents to Blue Wolf (the "Assignment"). The amount owing by the Debtor to Blue Wolf under the Loan Agreements as of June 23, 2010 was approximately $1,953,000.

16. In conjunction with the October 2007 change in ownership, the Debtor executed the junior secured promissory note to BGE in the original principal amount of $12,500,000. On or about October 26, 2007, BGE entered into a Subordination Agreement with Silicon (as modified by the Ratification and Amendment of Subordination Agreement dated October 9, 2009, the "Subordination Agreement"), which provides, *inter alia*, the respective rights and obligations of the Debtor's secured lenders, including, the subordination of the Debtor's indebtedness to BGE to the payment in full of all of the Debtor's obligations to Silicon, other than the payment of regularly scheduled interest payments to BGE. The amount currently owing to BGE is approximately $11,490,000.

## II. THE DIP LOAN

### A. General.

17. The terms and conditions of the DIP Loan are set forth in detail in the DIP Loan term sheet, a copy of which is attached as Exhibit A.[2]

18. The DIP Loan commitment is for a non-amortizing loan facility in the amount of up to $6,000,000 and contemplates an initial tranche of $3,000,000 to be disbursed to the Debtor upon interim approval of the DIP Loan.

19. The first $3,000,000 of the DIP Loan will be disbursed substantially in accordance with the Budget appended as Exhibit B, to be used to fund necessary overhead, general, and administrative expenses over the next four weeks and to provide financing for building working capital.

20. Among the primary terms of the DIP Loan are the following:

- Interest: Fifteen percent (15%) per annum. During the continuance of an Event of Default, advances, interest, fees and other amounts due will bear interest at a rate two percent (2%) per annum greater than the non-default rate.

- Termination Date: Earliest of (i) 90 days after Closing Date; (ii) effective date of a plan; (iii) 30 days after conversion of the case to Chapter 11 if a final order is not entered by such time; (iv) 60 days after entry of final order, or (v) the occurrence of an event of default after expiration of cure or grace periods.

- Availability: Up to 85% of eligible accounts; up to 65% of eligible inventory, and up to 70% of the forced liquidation value of eligible equipment, as well as an overadvance of up to $700,000.

- Security: Blue Wolf shall be granted a first priority perfected security interest in all assets of the Debtor and the guarantors. Blue Wolf shall also have an

---

[2] The foregoing is a summary of the terms and conditions of the DIP Loan commitment. All parties should refer to the DIP Loan commitment for the exact terms and conditions. To the extent that this summary contradicts any of the actual terms and conditions of the DIP Loan commitment, the provisions of the DIP Loan commitment shall govern the rights and obligations between the parties. Capitalized terms used in this summary not otherwise defined shall have the meaning ascribed to them in the DIP Loan commitment.

allowed superpriority administrative expense for all amounts advanced under the DIP Loan, except for the Carve Out.

- Carve Out: Fees owing to Clerk of Court and Office of United States Trustee. Allowed fees and expenses incurred by professionals retained by Debtor or Committee in amount not to exceed sum of all allowed fees and expenses incurred by such professionals prior to Termination Date, subject to amounts in Budget, plus after the occurrence of the Termination Date, an amount not to exceed the lesser of remaining availability under the DIP Loan or $30,000, less unapplied prepetition retainers.

- Fees: Commitment fee of $200,000. Loan Servicing Fee equal to $10,000 per month. Non-refundable unused commitment fee equal to fifty (50) basis points per annum.

- Required Payments: The Debtor may repay all or a portion of the Loan Agreements with the proceeds of the DIP Loan.

- Voluntary Prepayments: The Debtor may reduce the commitment under the DIP Loan on five business days' notice, with each reduction being in an amount of $100,000 or multiples of $50,000 in excess thereof

- Mandatory Prepayments: 100% of insurance and condemnation proceeds and tax refunds and the sale of any assets outside of the ordinary course of business, other than the contemplated sale of machinery and equipment.

- Events of Default: Include failure to make payments when due, noncompliance with covenants, breaches of representations and warranties, failure to satisfy or stay execution of judgments in excess of specified amounts, existence of materially adverse changes, conversion or dismissal of the case or the appointment of a Chapter 11 trustee.

- Loan Agreements. Blue Wolf shall receive the following adequate protection on its Loan Agreements: administrative expense priority status; replacement liens on postpetition assets, to the extent of any diminution in value of any prepetition collateral and the use of cash collateral, junior only to the liens on account of the DIP Loan; and interest on all principal owed on the Loan Agreements.

7

- <u>506(c) waiver:</u> The Debtor will not assert any surcharge under Section 506(c) of the Bankruptcy Code with respect to the lenders' prepetition liens.
- <u>Automatic Stay:</u> Granting the Lender relief from the automatic stay without further order of Court upon an event of default, subject to the right of the Debtor to challenge the occurrence of an event of default by requesting a hearing upon five (5) days' written notice to Blue Wolf, in which case pending the Bankruptcy Court hearing Blue Wolf will refrain from exercising its remedies with respect to the collateral.

### III.    REQUEST FOR INTERIM AND FINAL APPROVAL OF THE DIP LOAN COMMITMENT

21.    Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured credit by granting a secured lien on property of the estate. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is entitled to super-priority administrative expense status or which is secured by liens on the debtor's property.

22.    Generally, Sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of credit are not available under 364(a) or (b). *See In re Ames Dept. Stores, Inc.* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)("debtor is not required to seek credit from every possible source … [but only to] show that it has made a reasonable effort to seek other sources of credit available.")

23.    Against this backdrop, a Court will evaluate the facts and circumstances of a debtor's case, and will grant significant weight to a debtor's business judgment regarding the necessity for obtaining the requested financing. *Id.* at 40.

8

24. The Debtor is unable to obtain financing either in the form of unsecured debt allowable under Section 503(b)(1) of the Bankruptcy Code, or as debt secured only by a junior lien on the Debtor's assets.

25. Prior to entering into the DIP Loan term sheet with Blue Wolf, the Debtor conferred with approximately twenty (20) other potential lending or investment sources. The parties approached by the Debtor included conventional lenders, mezzanine lenders, and private equity sponsors. The Debtor had follow up discussions with each of the 20 potential financing sources and received proposals from four (4) of the entities. Each of the proposals was made on terms less favorable than that provided by Blue Wolf.

26. In order to prevent the harm that would result from a complete discontinuation of the Debtor's operations, Blue Wolf has agreed to provide the Debtor with postpetition financing upon the conversion of its case to Chapter 11 upon the terms described in this motion and, more particularly, the DIP Loan term sheet.

27. The proposed DIP Loan will grant Blue Wolf a senior lien on the Debtor's assets for the additional advances to be made. BGE has already consented to the imposition of additional liens in favor of Blue Wolf that are senior to its position, by virtue of the terms of the Subordination Agreement. The terms of the DIP Loan have been negotiated in good faith and at arm's length, and reflect the Debtor's exercise of its business judgment. The DIP Loan does not contain any of the terms listed in MLBR 4001-2(c), other than those set forth in bold in the DIP term sheet.

28. The Debtor believes that Blue Wolf, as the successor in interest to Silicon, is uniquely positioned to provide it with the necessary recapitalization required to ensure a successful reorganization. The Debtor further believes that the terms of the DIP Loan are

9

consistent with current market conditions and are as good or better than terms which could be secured by the Debtor from a new financing source not already in a lending arrangement with the Debtor. Without the DIP Loan, the Debtor's continued operations would not be possible, and serious and irreparable harm to the Debtor and its estate would result. The DIP Loan will therefore preserve, maintain and enhance the value of the Debtor's assets, including maintaining the going concern value of the Debtor's operations and preserving nearly seventy (70) jobs.

29. The Subordination Agreement, as modified, provides in Section 2 that all of the BGE debt is subordinated in right of payment to all obligations of the Debtor to Blue Wolf (as successor to Silicon) now existing or hereafter arising, provided that the aggregate principal amount of the senior obligations shall not exceed $6,500,000 without the prior written notice to, and prior written consent of, BGE. The Subordination Agreement further provides, in Section 5, that in the event of the Debtor's bankruptcy, all provisions of the Subordination Agreement shall remain in full force and effect and that the claims of Blue Wolf against the Debtor and its estate shall be paid in full prior to any payment to BGE. Section 9 of the Subordination Agreement provides that Blue Wolf may take such action with respect to its senior debt as it may deem appropriate in its sole discretion, including increasing the principal amount of the indebtedness. The DIP Loan will not increase the principal amount of the Blue Wolf loan to the Debtor above the $6,500,000 principal amount previously agreed to.

30. The foregoing provisions indicate BGE's acquiescence to the additional advances contemplated to be made herein by Blue Wolf, and the senior collateral and payment rights accorded to such additional advances.

### IV.  USE OF CASH COLLATERAL

31. By this motion, the Debtor also requests authority to use cash collateral, including the proceeds of any accounts receivable collections, during the interim period. Cash collateral proceeds will be applied first to any operating expenses, and the Debtor will draw on the DIP Loan facility only to the extent cash collateral is not adequate to fund expenses as set forth in the Budget.

32. Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to be used, sold or leased by the debtor must receive adequate protection of such interest before the debtor may use, sell or lease such property. 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code provides that when adequate protection is required under section 363 of the Bankruptcy Code, such adequate protection may be provided by, *inter alia*, "requiring the trustee [debtor-in-possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title . . . results in a decrease in the value of such entity's interest in such property," or "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1), (2).

33. In order to provide Blue Wolf with adequate protection on account of the use and disposition of the cash collateral with respect to its prepetition lending facility, Blue Wolf shall receive administrative expense priority status, a replacement lien on all postpetition assets, to the extent of any diminution in value of any prepetition collateral and the use of cash collateral, junior only to the liens arising under the DIP Loan, and payment of interest at the default rate on the principal amount of the prepetition lending facility and fees accruing under such agreement.

The replacement liens will not extend to subchapter 5 avoidance actions and will be subject to the Carveout.

### EXPEDITED DETERMINATION REQUESTED

34. The Debtor requests, pursuant to MLBR 9013-1(g), that the Court schedule an expedited hearing on the motion, as the Debtor requires the relief sought herein to operate its business and authority to honor payroll funded prior to the Order for Relief.

35. Absent the relief requested herein, the Debtor's estate may be harmed.

### VI. NO PRIOR REQUESTS

36. No prior request for the relief sought in this motion has been made to this or any other court.

### VII. NOTICE

37. The Debtor has served this motion by electronic mail (where available), facsimile and first class mail on all of the Debtor's creditors and the Office of the United States Trustee. The Debtor submits that such service is sufficient given the relief requested in this motion and the Debtor's circumstances.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

A. Finding that the notice of this motion was sufficient and appropriate given the relief requested;

B. Entering an order, substantially in the form attached, approving the Interim Financing;

C. Authorizing the Debtor to obtain final post-petition financing as is described in the DIP Loan Agreement and this motion;

D. Authorizing the Debtor to grant to Blue Wolf liens and security interests against all of the Debtor's assets that are senior to all other liens and security interests;

E. Authorizing interim use of cash collateral necessary to avoid immediate and irreparable harm;

F. Scheduling a final hearing with respect to the approval of the DIP Loan Agreement and continued use of cash collateral no later than thirty (30) days from the entry of the order approving the Interim Financing; and

G. Granting such further relief as is just and proper.

GLOUCESTER ENGINEERING CO., INC,
By its proposed counsel,


 /s/ Andrew G. Lizotte
Charles R. Bennett, Jr. (BBO #037380)
Andrew G. Lizotte (BBO #559609)
Hanify & King, P.C.
One Beacon Street
Boston, MA  02108
Ph: (617) 423-0400
Fax: (617) 556-8985

Dated:  June __, 2010
565838

13